## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR AN ARREST WARRANT AND A SEARCH WARRANT

I, Elizabeth Bedoya, being duly sworn, state:

**Introduction and Agent Background**

1. I have been a Special Agent with the Criminal Investigation division of the Internal Revenue Service ("IRS") since 2009 and have been assigned to IRS-CI's Boston Division since 2010. My responsibilities include the investigation of possible violations of federal law, including violations of the Internal Revenue laws (Title 26, United States Code), Bank Secrecy Act (Title 31, United States Code), Money Laundering Control Act (Title 18, United States Code, Sections 1956 and 1957), and related offenses. My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2. As set forth below, there is probable cause to believe that Clarance JONES ("JONES") has engaged in a scheme, dating back to at least 2013, to assist Massachusetts State Lottery winners to evade IRS reporting requirements and thereby to avoid paying taxes, and has himself filed false tax returns as part of the scheme.

3. Accordingly, I submit this affidavit in support of a criminal complaint charging JONES with conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371, and filing false tax returns, in violation of Title 26, United States Code, Section 7206(1).

4. Based on the facts set forth herein, there is also probable cause to believe that the location information described in Attachment B will assist law enforcement in arresting JONES, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4). I therefore also submit this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section

2703(c)(1)(A) for information about the location of the mobile phone assigned the number (781) 526-0163 (the "Target Mobile Phone"), which is believed to belong to JONES. The service provider for this phone is T-Mobile US, Inc., ("T-Mobile") a wireless telephone service provider that accepts service of process at 4 Sylvan Way, Parsippany, New Jersey 07054. The Target Mobile Phone is further described in Attachment A, and the location information to be seized is further described in Attachment B.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from witnesses and other law enforcement agents. This affidavit is intended only to show that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

### Probable Cause

A. <u>General Background</u>

6. Pursuant to the Internal Revenue Code and attendant regulations, individual taxpayers generally are required to report their income, attendant tax obligations, and, where appropriate, any claim for a refund on a U.S. Individual Income Tax Return, Form 1040, which must be filed annually with the IRS.

7. Gambling income is fully taxable and must be reported to the IRS. Gambling income may include, but is not limited to, winnings from state lotteries. To encourage compliance with the obligation to pay taxes on gambling winnings, lotteries, sweepstakes, race tracks and other gambling operators are required to report to the IRS on a Form W-2G each transaction in which net winnings exceed $600 and are at least 300 times the amount of the wager.

8.  The Form W-2G reports to the IRS the winner's name, address and taxpayer identification as well as the amount of the gambling income and any taxes withheld. The winner must declare, under the penalties of perjury, that the name, address and taxpayer identification number listed on the Form W-2G are correct, and that "no other person is entitled to any part" of the payments listed on the form.

9.  "Ten-percenting" is a practice by which lottery winners seek to evade these IRS reporting requirements and avoid payment of the applicable taxes by having another individual cash the winning ticket(s) on their behalf, under the other individual's name. In exchange, the individual who cashes the winning ticket(s) and completes the Form W-2G retains a percentage of the winnings, sometimes as high as 10 or 20 percent of the proceeds.

10. As set forth below, I believe that JONES is engaged in ten-percenting. Notably, in or about and between January 2011 and March 2017, JONES cashed more than 7,600 winning Massachusetts State Lottery tickets, typically worth between $600 and $10,000 each, and claimed total winnings of more than $11,376,000.

11. An analysis of JONES' federal tax returns for tax years 2011 through 2017, however, show that JONES paid less than $15,836[1] in federal income taxes on a total of approximately $51,561 in net income during this period. JONES has been able to do so by declaring on his tax returns that he is a professional gambler and offsetting virtually all of his gambling winnings with alleged gambling losses.

---

[1] In my earlier Affidavit in support of a tracking device in this case, I stated that JONES had paid taxes of less than $10,000 on approximately $50,000 in net income. JONES filed an amended return in which he paid a modest additional amount.

3

B. <u>Attempt by JONES To Cash a Stolen Massachusetts State Lottery Ticket</u>

12.     In or about December 2015, the Massachusetts State Police received information that an elderly person (hereinafter "Individual A") had a winning scratch lottery ticket stolen from Individual A's residence in Swampscott. On or about December 11, 2015, JONES attempted to cash the stolen ticket at the Massachusetts State Lottery Office in Woburn, MA.

13.     When questioned about the ticket, JONES, through his attorney, furnished the Massachusetts State Lottery Commission ("MSLC") with a form stating that another individual ("Individual B") had assigned the ticket to JONES. JONES's attorney provided the MSLC a photocopy of a Maryland driver's license in the name of Individual B.

14.     When agents interviewed Individual B, however, she denied ever owning the ticket in question or signing any forms relinquishing it to JONES. Individual B said that she had never before seen the form purporting to transfer the lottery ticket to JONES, that the signature on the form was not hers and that she had no idea who JONES was. According to Individual B, the driver's license accompanying the form was a fake license that had been confiscated from her at a store (hereinafter "Lottery Ticket Sales Location #1") where she had attempted to purchase alcohol as a minor.

C. <u>Physical Surveillance of JONES by Law Enforcement</u>

15.     In or about and between July 2016 and October 2016, agents conducted surveillance of JONES. On several Fridays, the investigators observed the following, or a similar pattern of behavior: JONES and another man arrived in the van at a store where lottery tickets are sold ("Lottery Ticket Sales Location #2"), the other man entered the store for a few minutes, and then came back to the van. The van then drove to the MSLC office in Woburn, Massachusetts. Shortly thereafter, the van drove to a Santander Bank branch, where bank

records demonstrate that JONES cashed a number of checks payable to him that were issued by the Massachusetts Lottery Commission. The van then returned to Lottery Ticket Sales Location #2 where the individual accompanying JONES again went inside for a few minutes.

16. Lottery records for the days on which this surveillance took place show that on each occasion JONES cashed about 20 to 30 lottery tickets. For each ticket JONES cashed, he signed a claim form on which he declared, under the pains and penalties of perjury, that he was the "sole recipient" of the winning lottery payment and that he was "not claiming [the] prize to assist another in the avoidance of financial obligations."

D. <u>GPS Tracking of JONES</u>

17. On or about Tuesday, November 29, 2016, pursuant to court authorization, agents installed a location monitoring device on the van used by JONES.

18. MSLC records show that on or about and between November 29, 2016 and January 6, 2017, JONES cashed approximately 133 winning lottery tickets with a gross value of approximately $177,931, for total net winnings after tax withholding of approximately $169,037.32. These tickets were issued to approximately 104 different agents located in approximately 29 different cities in Massachusetts. During the same period, the GPS tracking device evidenced JONES in only 12 of the 29 different cities. Accordingly, it is extremely unlikely that all of the winning tickets were purchased by him during the course of his own gambling activities.

19. GPS tracking records evidence the same pattern of activity between JONES and Lottery Ticket Sales Location #2 that agents had observed earlier. For instance, on Friday, December 2, 2016 and Friday, December 16, 2016, the GPS tracking device indicated that Jones

stopped in sequence at Ticket Sales Location #2, the MSLC office in Woburn, a branch of Santander Bank, and then back at Lottery Ticket Sales Location #2.

E. <u>Cooperating Witness #1</u>

20. On or about Monday, December 12, 2016, a confidential human source ("CHS") of the IRS attempted to cash a winning Massachusetts State Lottery ticket, with a value of $1,000, at Lottery Ticket Sales Location #2.[2] The CHS consensually recorded the interaction. A co-owner of the store—who subsequently became a cooperating witness for the government ("CW-1")—gave the CHS $800 in cash for the $1,000 ticket.

21. On or about the following Friday, December 16, 2016, JONES cashed the same winning ticket at the Woburn lottery office, and received the full face value of $1,000. In order to cash the ticket, JONES signed a form, under pains and penalties of perjury, falsely declaring that he was the "sole recipient" of the winning lottery payment and that he was "not claiming [the] prize to assist another in the avoidance of financial obligations."

22. A Massachusetts State Trooper thereafter contacted JONES's attorney and advised him that the ticket JONES cashed had been reported stolen. In response, JONES' attorney provided a Massachusetts State Lottery form falsely reflecting that the winning ticket had been

---

[2] The cooperating source was paid $600 for assisting investigators in this case by taking three winning lottery tickets to locations to be cashed. The source was previously convicted of possession of a controlled substance, for which he received a two-and-a-half year suspended sentence, and has admitted to the sale of lottery tickets, as described below. He has completed a whistleblower form in another investigation in which he is cooperating that may entitle him to financial benefits in the future. Information provided by the source has been corroborated by consensual recordings, documents, and interviews with other witnesses.

given to JONES by "Anothey Gonazes." The form does not list the name of either the CHS or of CW-1.

F. Information Provided by CW-1

23. CW-1 began cooperating with the government's investigation in or about July 2018 and is expected to plead guilty in the District of Massachusetts to conspiring to defraud the IRS, in violation of Title 18, United States Code, Section 371.[3]

24. CW-1 has advised the government that she illegally cashed lottery tickets for approximately ten years, during which time she paid the winning ticket holders a discount off the face value of the tickets—in violation of MSLC rules—and transferred the tickets to JONES, who cashed the tickets for their full value with the MSLC and split a portion of the proceeds with her.

G. Information Provided by CW-2

25. A second cooperating witness ("CW-2"), who is one of the owners of Lottery Ticket Sales Location #1, has similarly advised agents that he improperly cashed lottery tickets for customers—paying the winning ticket holders between 80 and 85 percent of the face value of the tickets—and then provided the tickets to JONES, who cashed them with the MSLC for their

---

[3] CW-1 is cooperating with the government's investigation in the hope of receiving leniency at sentencing. The information provided by CW-1 has been corroborated by consensual recordings—including the recording of the CHS's interaction with CW-1 in or about December 2016—as well as documents and interviews with other witnesses. Prior to CW-1's cooperation, however, during an interview with agents in May 2017, as agents were executing a search warrant of Lottery Ticket Sales Location #2, CW-1 falsely denied knowing JONES or cashing lottery tickets for him. CW-1 subsequently acknowledged that these earlier denials were untrue.

full value.[4] CW-2 said that JONES, whom he had known for approximately 10 years, split the proceeds of this scheme with him.

26. CW-2 said that in or about 2015, JONES confronted CW-2 regarding a winning lottery ticket JONES had obtained from CW-2 and redeemed. JONES told CW-2 that the ticket had been reported to the MSLC as stolen and that JONES needed to complete a form. CW-2 said he gave JONES a copy of Individual B's fake identification in order to complete the MSLC form. As noted above, JONES's counsel, on behalf of JONES, provided this form and the same fake identification to the MSLC in or about December 2015.

### The Need for Precise Location Information

27. In or about January 2018, the apartment building in Lynn, Massachusetts where JONES lived was destroyed in a four-alarm fire.

28. Agents have not been able to locate JONES since the fire. Driver's license and motor vehicle information, as well as other public records, continue to list JONES at his old address.

29. Agents have received information that JONES is still in the area and frequents a casino in Plainview, Massachusetts. Massachusetts State Police Gaming Enforcement Unit records show that JONES has visited the Plainridge Park Casino 38 times in the past six months.

---

[4] CW-2 is expected to plead guilty in the District of Massachusetts to filing a false tax return, in violation of Title 26, United States Code, Section 7206(1). CW-2 is cooperating with the government's investigation in the hope of receiving leniency at sentencing. The information provided by CW-2 has been corroborated by consensual recordings, documents and interviews with other witnesses.

Although it varies, it appears that JONES mostly arrives at the casino Fridays or Saturdays and averages approximately five hours per visit while on the property.

30.     The precise location information requested by the proposed warrant will enable agents to determine the current location of JONES, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41 (c)(4).

31.     Public records list JONES as the subscriber for mobile phone number (781) 526-0163.

### The Relevant Technology

32.     I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

## Authorization Request

33.     I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.[5]

34.     I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Mobile Phone on T-Mobile's network, and at such intervals and times as directed by the government. The government will compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

35.     I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order T-Mobile not to notify any person (including the subscribers or customers to whom the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b) T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert

---

[5] 18 U.S.C. 2703(c) authorizes a "court of competent jurisdiction" to issue a search warrant for the kinds of records that this application seeks. A "court of competent jurisdiction" includes a district court ("including a magistrate judge") that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation giving the target an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. *See* 18 U.S.C. § 2705(b).

36. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Mobile Phone outside of daytime hours.

37. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court, except that the government may produce them in criminal discovery and provide the search warrant to T-Mobile. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Elizabeth Bedoya, Special Agent
Internal Revenue Service

Subscribed and sworn to before me on 10/15/2018

_____
Hon. Robert B. Collings
United States Magistrate Judge

## ATTACHMENT A

Information about the location of the mobile phone assigned the telephone number (781)526-0163 (the "Target Mobile Phone"), whose service provider is T-Mobile US, Inc., a company that accepts process at 4 Sylvan Way, Parsippany, New Jersey 07054.

## ATTACHMENT B

All information about the location of the Target Mobile Phone described in Attachment A for a period of thirty days from the date of service of this warrant, during all times of day and night, including:

1. E-911 Phase II data;

2. GPS data;

3. latitude-longitude data;

4. other precise location information; and

5. data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Mobile Phone.

This warrant does not authorize the collection of any content of any communications.

T-Mobile US, Inc. ("T-Mobile") must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Information about the location of the Target Mobile Phone unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Mobile Phone on T-Mobile's network, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

T-Mobile shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the

Court extends such period under 18 U.S.C. § 2705(b). *See* 18 U.S.C. § 2705(b). T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.