UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:19-cr-10122-FDS |
| | ) | |
| | ) | |
| CLARANCE JONES | ) | |

### **DEFENDANT'S SENTENCING MEMORANDUM**

**I.     Introduction**

Although the advisory guidelines in this case recommend a sentence of 30-37 months of incarceration, the guidelines are completely unable to capture the full arc and value of Clarance Jones' remarkable life. Born in 1938 into a deeply racist and unjust society, he has devoted his entire life to helping the United States make good on its yet-unfulfilled promise that all persons are created equal. He joined the NAACP at an early age, was a field marshal at Dr. Martin Luther King Jr.'s 1963 March on Washington, and later was president of the North Shore NAACP for nearly two decades. His life of good works is demonstrated in the 22 letters of support and other materials submitted as sentencing exhibits. As argued below, Clarance Jones' history and characteristics are strong support for a significant downward variance.

Clarance Jones is also 81 years old and uses a wheelchair because he is unable to walk more than a few steps at a time. His wife of over 60 years, Lillie, is 80 years old and also in poor health. Mr. Jones' age and serious medical conditions, and the need for him to remain close to his wife in her later years, are also compelling reasons for a downward variance.

1

That Mr. Jones broke the law after living an inspiring life of good works is a source of great shame to him. In this case, he cashed winning lottery tickets on behalf of others, claimed the tickets were his own, and illegally offset that income with gambling losses. This allowed the actual winners to avoid paying taxes on their winnings and deprived the federal government of revenue. The winners received between 80 and 90 percent of the ticket value, while Mr. Jones split the remainder with the storeowners. PSR ¶ 14. A typical $1,000 ticket thus often left $50 for Clarence Jones. None of the money he made went to a life of luxury, as it was primarily lost through gambling. PSR ¶ 20.

The unique circumstances of this offense and the unique history and characteristics of Clarence Jones ultimately warrant a sentence of time served and two years supervised release with the first six months spent in home confinement. Sentencing with parsimony under the statute requires a "holistic inquiry" because "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors through which runs the thread of an overarching principle." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008). The tapestry before the Court in this case is one that does not require incarceration because it is not *necessary* to send Clarence Jones to prison at this point in his life and in light of his and his wife's age and medical conditions. A sentence of time served with two years of supervised release, including six months of home confinement, is one that is "*minimally* sufficient to achieve the broad goals of sentencing." *Id*. (emphasis added).

## II. The nature and circumstances of the offense show that Clarance Jones' gains were primarily lost on gambling, while the benefit of the tax avoidance was spread among an unknown number of co-conspirators.

Over four years, Clarance Jones cashed tickets worth $6,331,791. PSR ¶ 18. He received somewhere between five and ten percent of that total, PSR ¶ 14, which equals approximately $315,000 to approximately $630,000. The yearly average of money he received over four years was thus somewhere between $79,000 and $158,000.

The money that Clarance Jones obtained from his crime did not buy him a life of luxury. During that entire period he lived with his wife in modest rental apartments in Lynn. PSR ¶ 63. When their home tragically burned in January 2018, Exhibit E, he did not have the resources to find another. At the time of the fire his wife was living in a nursing home recovering from a serious heart attack one month earlier. PSR ¶ 63. After the fire, and because they were living separately at the time of their displacement, she was able to secure public housing on her own at an assisted-living facility for seniors. PSR ¶ 64. Mr. Jones, however, was simply left without a home and lived out of his van for nine months until his arrest in this case in October 2018. PSR ¶ 63. Before his arrest he had been too proud to accept his son's help and move in with him in Lynn. After his arrest he finally accepted his son's help as a condition of release. *Id*. In December 2018 he obtained his own public housing, but has since been issued a notice of intent to evict due to the charges in this case. *Id*. Mr. Jones has requested an appeal of that intent but has not received a response. *Id*.

Counsel believes that the public housing authority may mistakenly believe due to publicity about this case that Mr. Jones pocketed millions of dollars for his own benefit. Of course that is not true. He received between five and ten percent of the total winnings over four years. PSR ¶ 14. He has completed a financial affidavit as part of the presentence

investigation, which reveals that his assets are limited to three bank accounts with negative balances, a 13-year-old van with 180,000 miles, and approximately $10,000 in debt. PSR ¶ 78. He survives on $800/month in Social Security.

The question then remains as to where the money he received ended up. Mr. Jones acknowledges that he spent some of his gains on family members' expenses to attend annual reunions. See Exhibit A, letter of Regina Sutson Babb; Exhibit B, letter of Dustin Ward. His family members of course had no idea of his offense, and clearly would not have accepted his support if they had known. See generally Exhibits A and B. For approximately 20 years Mr. Jones ran a commercial cleaning business, which provided him with the financial means to assist family members in need. PSR ¶ 76. For example, when his brother was murdered in 1982, he paid the funeral expenses and provided support to his brother's family. His nieces both note his support in their letters, and describe how crucial it was in such a traumatic time. Exhibit A, letters of Barbara J. Sutson and Jennie R. Sutson. Clarance Jones also supported various community groups throughout his life, as noted throughout the many letters of support for him. It is clear from the poverty of his later years that he wanted to continue to support others even after he was no longer able to do so. His grandson even acknowledges that in hindsight it is clear that Mr. Jones kept his finances hidden out of shame. Exhibit A, letter of Nathan Jones.

The majority of his gains, however, passed on quickly through his gambling. Through its investigation, the government is aware that prior to his arrest in this case he was spending a significant amount of time at casinos. Dkt. 3, Complaint, ¶ 29. He reported significant gambling losses during the years of his offense conduct, and the government has not challenged that portion of his tax returns. PSR ¶ 20. Mr. Jones has reported to counsel that in

addition to casinos he also gambled on horse races and through state-sponsored gambling such as lotteries and keno. One of his supporters notes in her letter that he "was always seen at the corner store playing keno." Exhibit B, Letter of Linda Hegan. To his detriment, gambling appears to have become both a habit and a social activity for Mr. Jones as he grew older. He supported this habit with his gains from this offense. The ultimate recipients of the gains, however, were the casinos, racetracks, and state gambling activities where he lost the money.

 The defense agrees that a reasonable estimate of the tax loss over the four years of the offense conduct is $313,025. PSR ¶ 22. Of course, the taxes in this case should have been paid by the actual winners. With a total of 4,679 tickets over four years, PSR ¶ 18, the unknown co-conspirators in this case could number into the hundreds or even exceed one thousand. The benefit of the tax avoidance was thus diffuse because it was desired and obtained by so many people. Clarance Jones agrees that a two-point offense level enhancement for being an organizer is appropriate based on his role. PSR ¶ 34. However, he did not commit this crime alone. Many people in the community saw an opportunity to avoid the inconvenience and possible expense of properly reporting their winnings. The store owners referred those people to Mr. Jones and took a finder's fee equal to Mr. Jones' share even though he took the risk of claiming the tickets as his own. The advisory guidelines range is driven primarily by the tax loss, but because the benefit of this crime was widespread, Mr. Jones should not bear the full weight of a guidelines sentence.

### III.     Clarance Jones' inspirational life supports a downward variance.

Clarance Jones was born into a deeply racist and unjust society. He and other black children were forcibly segregated from their white peers in schools and places of public accommodation. PSR ¶ 55. His family was fortunate enough to own property, but that only made them targets of the Ku Klux Klan, who burned crosses on their lawn and tried to run them out. *Id*. As a child, he endured painful discrimination every single day. *Id*.

His mother, Lillian Bonner, was determined not to allow her son to grow up in such a hateful world. In 1940, when he was just two, she was one of three victims in a criminal case against white election officials who prohibited them from registering to vote because they were black. *United States v. Ellis*, 43 F. Supp. 321 (D.- S.C. 1942) (submitted along with supporting documents at Exhibit D). In a letter to the NAACP written shortly after the event, one of the other victims recounted being told that "darkies have never registered in South Carolina and especially in Cherokee County." Exhibit D, August 25, 1940 letter of Lottie Gaffney.[1] Thurgood Marshall himself, who was Special Counsel at the NAACP at the time, became involved in supporting Ms. Bonner and the other victims. Exhibit D. Counsel has been informed that the white election officials were ultimately acquitted by an all-white jury, but despite that outcome, Clarance Jones learned from his mother the necessity of standing up for what is right.

---

[1] The supporting documents in this case were provided to counsel by Mr. Jones' son, who obtained them from the Library of Congress.

In addition to his mother, Clarance Jones was also directly inspired by one of his teachers, who was active in the civil rights movement. In discussing her during the presentence interview, Mr. Jones was overcome both with gratitude and with shame for failing to live up to his own ideals and those of his role models through his conduct in this case. PSR ¶ 55.

Inspired by those around him, Mr. Jones set out early on a path to tackle injustice. After graduating high school, he and his wife moved to Washington, D.C. and joined the NAACP. PSR ¶ 61. While there he served as a marshal during the 1963 March on Washington under the direction of Roy Wilkins, the director of the NAACP at the time. *Id*. As a marshal, he volunteered to be one of many monitoring the enormous event to make sure that it remained peaceful. *Id*.

Later in 1963, Clarance and Lillie Jones moved to Lynn, Massachusetts. PSR ¶ 62. He took a job at a factory, and subsequently formed his own commercial cleaning business. Exhibit A, Letter of Lillie Jones; PSR ¶ 76. The couple raised four children, two of whom they adopted as infants. PSR ¶ 64. Tragically, they also lost two other children just days after they were born. *Id*.

During his time in Lynn, Clarance Jones became a central figure in the community through his extensive activism. He was the president of the local chapter of the NAACP for 18 years. PSR ¶ 62; See also Exhibit A, letter of Lillie Jones; Exhibit B, letters of Carol Jones, Mary E. Perry-Joyner, etc. He founded the Lynn Education Action Program (LEAP), an after-school tutoring program for disadvantaged students. PSR ¶ 62; Exhibit B, letter of George Anderson; Exhibit C. He formed a community association known as the Gaylord Club, which many of his supporters note was an important presence in the fight for civil

7

rights. PSR ¶ 62; See generally Exhibit B; Exhibit C. He founded a teen center called Teen City. Exhibit B, letters of Carol Jones, Mary E. Perry-Joyner, Gianna Sweeney, etc. At one time he was president of the Community Minority Culture Center. Exhibit B, letter of Carol Jones. His importance to the Lynn community is so great that two city councilors have submitted letters on his behalf. Exhibit B, letters of Council Vice President Buzzy Barton, Councilor Richard Colucci.

The letters in support of Clarance Jones are full of examples of how he inspired others, far too many to cite them all individually. Those examples include several young people who credit Mr. Jones with providing them with opportunities that changed the course of their lives, whether it be a job referral (letter of Sheila Valric), encouragement to form a singing group (letter of Mary E. Perry-Joyner), or the opportunity to attend a national NAACP conference that led to a college scholarship (letter of Georgia Anderson Haynes). Exhibit B. Just as Clarance Jones was inspired by his teacher so many years ago, in turn he has inspired countless other young people. They now all feel the same gratitude and love for him that he has for his teacher. The Lynn community, and our society as a whole, is stronger with Clarance Jones than without him.

### IV. **Although applicable, the enhancement for failing to correctly identify the source of income from criminal activity is redundant on the facts of this case.**

The defense agrees that the two-point enhancement from USSG § 2T1.1(b)(1) applies because Mr. Jones failed to correctly identify more than $10,000 in a year from criminal activity. PSR ¶ 32. The relevant application note says broadly that the enhancement applies to any

conduct constituting a criminal offense. USSG § 2T1.1, Application Note 4. Mr. Jones' claim that the tickets were his own was admittedly criminal.

However, the enhancement most logically applies when the tax fraud was used to try to hide separate criminal activity. Here, the other criminal activity was so entwined with the tax fraud as to be inseparable. The goal was the tax fraud itself, and the severity of that conduct is fully captured by the amount of the tax loss and the enhancement for Mr. Jones' role as an organizer. The other "criminal activity" in this case is so bound up with the tax fraud so as not to increase its severity any further. Where an enhancement does not capture conduct that distinguishes the offense under consideration, the Court need not consider it in determining sentence, as no guideline is presumed to be reasonable. *Nelson v. United States*, 555 U.S. 350, 252 (2009) (per curiam). Without that two-point enhancement, Mr. Jones' offense level would be 17, and the advisory range would be 24-30 months. Mr. Jones submits that this is a more accurate range based on the specific facts and circumstances of this case, but that a sentence of served, supervised release and home confinement is justified based on all the sentencing factors of 18 U.S.C. § 3553(a).

### V. **Two years of supervised release and six months of home confinement would be a significant sentence for Clarance Jones.**

The recommended period of supervised release and home confinement should not be considered a light sentence. Indeed, the Supreme Court has recognized probation as a significant sentence:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving

permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual 'special conditions' imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48-49 (2007).

A period of home confinement will be more severe for Mr. Jones than for most offenders. Because he is retired, he will not have justification to leave his home for any significant amount of time for employment. Additionally, although he is married, due to the circumstances surrounding his wife's heart attack and the fire that destroyed their home, they now live separately. The punitive effect of home confinement would thus not be softened by living with family members. Mr. Jones does request that any period of home confinement include regular periods during which he is permitted to visit his wife.

Any period of supervised should also include appropriate conditions for Mr. Jones. He has been on pretrial release in this case for 11 months and has complied with all pretrial conditions, PSR ¶¶ 1, 4,including that he have no involvement with the lottery. Dkt. 8, Condition 7(s). Given that his problematic gambling drove his offense, that condition should be broadened on supervised release to prohibit him from gambling of any kind. Mr. Jones also agrees to all the special conditions recommended by the probation department and included within the plea agreement. PSR p.23.

## VI. The defense's recommended sentence would not result in unwarranted sentencing disparity.

Two co-conspirator storeowners who were charged as part of this case have both already been sentenced to one year of probation. PSR ¶ 6. Both were given an opportunity to cooperate prior to arrest, and a review of the docket appears that neither was arrested as both pled guilty to

Informations. Mr. Jones' acknowledges his role and accordingly recommends a more severe sentence. His sentence already included a day of incarceration via his arrest. Even one day in custody was exceedingly difficulty given the medical conditions that confine him to a wheelchair. The recommended period of supervision is twice as long as that imposed on the co-conspirators. Most significantly, neither co-conspirator was sentenced to any period of home confinement.

Moreover, sentences for tax fraud cases in this District are also frequently below the advisory guideline range to degrees similar to what is requested here. In each of the following cases, the Court imposed a sentence significantly below the advisory range, and in all but one at least a year below the range:

| Case | | GL Range | Sentence |
|---|---|---|---|
| *Holland* | 18-cr-10371-MLW-1 | 24-30 | 6 months, 3 years SR |
| *O'Connell* | 18-cr-10371-MLW-2 | 24-30 | 6 months, 3 years SR |
| *Ingram* | 18-cr-10018-RWZ | 12-18 | 3 years probation, 6 months Community Confinement |
| *Cardoso* | 17-cr-10229-PBS | 10-16 | 1 year probation, 10 months Home Confinement |
| *Paczkowski* | 16-cr-10277-GAO | 33-41 | 6 months, 1 year SR |
| *Molloy* | 16-cr-10212-GAO | 18-24 | 1 year probation |
| *Osgood* | 16-cr-10055-DJC | 18-24 | 1 day, 1 year SR |
| *McCullough* | 15-cr-40031-TSH-1 | 51-63 | 12 months and a day, 3 years SR |
| *McCullough* | 15-cr-40031-TSH-2 | 37-46 | 8 months, 3 years SR |
| *Davis* | 15-cr-40031-TSH-3 | 30-37 | 6 months, 3 years SR |

| *Hammond* | 13-cr-10265-FDS | 30-37 | 6 months, 3 years SR |

The significant downward variances in the above 11 recent tax cases within this District demonstrate that a sentence of two years supervised release and six months home confinement for Clarance Jones on the particular facts of this case would not result in unwarranted sentencing disparity. Mr. Jones recommends a sentence significantly greater than those already imposed on the co-conspirators, but it is not necessary that it include a period of incarceration.

### VI. The other goals of sentencing do not require incarceration of Clarance Jones.

Any sentence must not be any greater than "necessary" under 18 U.S.C. § 3553(a). Further, any such necessity must be based on the stated purposes of sentencing. Just as with the purpose of avoiding unwarranted sentencing disparity under subsection (a)(6), the other purposes of sentencing also do not require Clarance Jones to be imprisoned.

It is clear, based upon the exemplary life he has lived, that incarceration is not necessary to "protect the public from further crimes of" Clarance Jones. 18 U.S.C. § 3553(a)(2)(C). Mr. Jones is not a threat to the public, and he has publicly and privately accepted responsibility for his actions. Given that he is 81 years old and has no other convictions in the last 35 years, he simply does not present any risk of recidivism. For the same reason, there is no need to imprison him in order to provide specific deterrence. 18 U.S.C. § 3553(a)(2)(B). As to general deterrence, the investigation of Mr. Jones has generated significant publicity as a warning to others who might consider similar conduct. More importantly, a sentence of incarceration for Mr. Jones would likely not provide any greater deterrence for those seeking to avoid tax obligations. The National Institute of Justice, a branch of the Department of Justice, cites research that shows that the fact

of being caught is a greater deterrent than the punishment, and that increasing the severity of punishment does little to deter crime. "Five Things About Deterrence," National Institute of Justice, May 2016, available at https://www.ncjrs.gov/pdffiles1/nij/247350.pdf. Placing Clarence Jones in prison will simply not deter others, even assuming that this highly publicized investigation has not produced procedural changes at the lottery that make similar schemes impossible or easier to detect.

Any sentence must "promote respect for the law" and provide "just punishment." 18 U.S.C. § 3553(a)(2)(A). Two years of supervised release and six months of home confinement accomplishes those purposes for Clarence Jones. As explained above, this is not a light sentence for an 81-year-old man who lives alone and feels great shame for the way he failed to live up to his own ideals.

### VII. **Clarence Jones' age and serious medical conditions put him at risk in the Bureau of Prisons, and any significant sentence of incarceration carries a risk that either he or his wife will pass while he is incarcerated.**

At 81 years of age, Clarence Jones suffers from several serious medical conditions. Medical records document that he suffers from poorly controlled type 2 diabetes, hypertension, hyperlipidemia, edema, asthma, and prostate cancer. PSR ¶ 67. He takes a litany of medications to treat these conditions. *Id*. He has debilitating arthritis which confines him to a wheelchair, as he cannot take more than a few steps on his own. *Id*.

The Bureau of Prisons is not well-equipped to care for elderly inmates, especially elderly inmates with serious medical issues like Mr. Jones. A 2008 audit by the Office of the Inspector General (OIG) found systemic deficiencies in Bureau of Prison's (BOP) delivery of health services. It found that at a number of institutions, BOP did not provide required medical services

13

to inmates, including inadequate treatment for chronic conditions, failure to properly monitor side effects of medications, allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious conditions. See U.S. Dep't of Justice, Office of the Inspector General Audit Division, *The Federal Bureau of Prisons Efforts to Manage Inmate Health Care*, ii-xix, 32-34 (2008) (available at http://www.justice.gov/oig/reports/BOP/a0808/final.pdf). More recently, in 2016, the OIG performed a review of the BOP's medical staffing challenges. U.S. Dep't of Justice, Office of the Inspector General Evaluation and Inspections Division, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (2016) (available at https://oig.justice.gov/reports/2016/e1602.pdf). The review found that chronic staffing shortages "limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs." *Id* at i. Placing Clarence Jones in this environment would constitute excessive and unnecessary punishment by placing him at serious risk for inadequate care.

Clarence Jones' age and use of a wheelchair alone make federal incarceration much more dangerous. A report of the National Institute of Corrections has found that "management problems with elderly inmates…are intensified in the prison setting and include: vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, [and a] need for special physical accommodations in a relatively inflexible physical environment." U.S. Dep't. of Justice, National Institute of Corrections, *Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 9-10. (2004) (available at

14

https://s3.amazonaws.com/static.nicic.gov/Library/018735.pdf. The report also notes that first time offenders "are easy prey for more experienced predatory inmates." *Id* at 10.[2]

Lillie Jones is 80 years old and has required significant assistance since a serious heart attack in December 2017. PSR ¶ 64. Like Mr. Jones, although she is not terminally ill, she is also not in good health. A guidelines sentence as requested by the government would carry a grave risk of either Mr. or Mrs. Jones passing away during his incarceration. Due to their difficult circumstances, Mrs. Jones already suffers from living apart from her husband. PSR ¶ 65. Despite living apart, the couple are still very much in love and rely greatly on each other, as demonstrated in Mrs. Jones' comments to the presentence report writer and in her letter to the Court. PSR ¶ 65; Exhibit A, letter of Lillie Jones.

Clarance and Lillie Jones embarked on journey together more than 60 years ago. They devoted themselves to their family and their community. Their commitment to each other allowed them to raise four successful children and to survive the tragic deaths of two more. They faced down injustice daily to make a better world for their children and everyone's children. It is this remarkable journey that gives such poignancy to Mrs. Jones' words to the Court:

> We're old. We're frail. We're in poor health. The time we have ahead of us is far shorter than the time we've left behind. I just want it to be time we spend together.

Exhibit A, letter of Lillie Jones.

---

[2] In 1984 Mr. Jones was sentenced to 10 days in a house of corrections based on his inability to pay restitution. Because of the location and duration of that sentence, and the fact that it occurred 35 years ago, it would not reduce his vulnerability to more experienced offenders in the BOP.

## VIII. Conclusion

Clarance Jones and his wife Lillie have made the world a better place for all of us. That he failed towards the end of his life causes him great shame and remorse. He accepts that punishment is warranted. Yet that failure need not result in the undue hardship of incarceration for an elderly and sick man. In light of his personal history and characteristics, the nature and circumstances of the offense, and all the purposes of sentencing as argued above, a sentence of time served and two years of supervised release is sufficient but not greater than necessary.

        Respectfully submitted,
        CLARANCE JONES
        by his attorney
        */s/ Joshua Hanye*
        Joshua Hanye, BBO#661686
        FEDERAL PUBLIC DEFENDER OFFICE
        51 Sleeper Street, 5th Floor
        Boston, MA 02210
        617-223-8061

## CERTIFICATE OF SERVICE

I, Joshua Hanye, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF").

Date: September 19, 2019         */s/ Joshua Hanye*
                                                                          Joshua Hanye